**308 A.2d 467**

STATE *vs.* GERALD M. LACHAPELLE.

AUGUST 1, 1973.

PRESENT: Roberts, C. J., Paolino, Kelleher and Doris, JJ.

ROBERTS, C. J. This indictment charges Gerald M. Lachapelle with the murder of Robert L. Clouette on April 6, 1969. After a trial in the Superior Court to a jury, the defendant was found guilty of murder in the second degree and is now in this court prosecuting a bill of exceptions.

It appears from the evidence that at about 11:30 p.m. on April 5, 1969, having just left the home of his girlfriend, Margaret Desmarais, Gerald Lachapelle arrived at Angie's Cafe in Woonsocket. In the bar, Lachapelle engaged in conversation with Seril Esten, a person he had known as a child. About 1 a.m. Robert Clouette and Constance Lataille entered the cafe. They ordered something to drink and listened to music. At the bar, Clouette was sitting next to Lachapelle, with whom he conversed briefly. After 15 or 20 minutes Clouette and Mrs. Lataille left the cafe.

Mrs. Lataille testified that Lachapelle followed them out of the cafe, while Lachapelle said he spoke with Esten for three to five minutes before leaving. In any event, Lachapelle encountered Clouette and Mrs. Lataille on the sidewalk in front of the bar. The two men engaged in a brief conversation. Then Clouette went into the alley next to the cafe, and Lachapelle followed him. About a minute later Mrs. Lataille heard scuffling, and then the men emerged from the alley. Mrs. Lataille testified that Clouette showed her the blood on his chest and said that Lachapelle had stabbed him. Mrs. Lataille helped Clouette back to her apartment where her husband called the police. Upon arrival, the police summoned the rescue squad. Clouette died shortly after his arrival at the hospital. Lachapelle testified that after the fight he returned to the apartment of Margaret Desmarais where he was arrested at approximately 3:15 a.m.

No one other than defendant Lachapelle saw what happened in the alley. Mrs. Lataille testified that she did not hear what Clouette and Lachapelle talked about in the

bar or on the sidewalk. She did not see what occurred in the alley, but she did testify that Clouette said that Lachapelle stabbed him. Seril Esten testified that in the cafe Lachapelle told him that he had "a score to settle with" Clouette arising out of an incident when they were in prison together. Esten also said that Lachapelle asked him to drive the two of them home so Lachapelle could "do a job" on Clouette. Lachapelle, on the other hand, testified that Clouette had accused him in the bar of dating a girl named Margie while Clouette was in prison. Lachapelle did not know what Clouette was referring to, but Clouette said he would wait outside for Lachapelle. Lachapelle further testified that outside Clouette wanted to discuss the matter in the alley.

In the alley Clouette again accused Lachapelle of going out with his wife, a girl named Margie. Lachapelle asserted that Clouette grabbed him and punched him, and a fight ensued. Clouette, according to Lachapelle, fell on him, and at that time Clouette stabbed himself with his own knife. Lachapelle knew this because he felt Clouette's blood dripping on him. Lachapelle also claimed he had no knife with him at the time. The struggle continued, and the knife fell onto the ground. They both got up and left the alley. Mrs. Lataille assisted Clouette across the street. Lachapelle returned to the alley and picked up the knife. Lachapelle testified that he later threw both the knife and his blood-stained clothes into the Blackstone River. The knife was never recovered and thus never introduced into evidence.

We turn, first, to defendant's contention that the admission into evidence of certain statements he is alleged to have made at the police station immediately following his arrest constituted prejudicial error. Captain Charles Dubuque of the Woonsocket Police Department testified that when defendant was brought into the police station, he personally informed him as to the rights available to

him under *Miranda*. The defendant, indicating that he understood what his rights were, requested an attorney. Thereupon Deputy Chief Baillargeon called District Court Judge Beaudet, who instructed him to call Gerald M. Brenner, a member of the Rhode Island bar, to represent defendant. The arresting officer, Raymond Tempest, testified that Brenner was called at about 4 a.m. and that he had then taken defendant into a nearby office where he sat with him until Mr. Brenner arrived about 4:20 a.m.

Tempest testified that as they were sitting there, defendant remarked, "I'm really in a jam this time," and inquired of the officer as to what would happen to him. The officer replied that he did not know but then proceeded to ask defendant why he had used the knife on Clouette, who was smaller in stature than defendant. According to Tempest, defendant replied that he had a "beef" to straighten out with him. On redirect examination Tempest testified further that he had asked defendant what he had done with the knife, and defendant answered that he had thrown it into the river behind Roger's Diner. The record makes it clear that defendant was subjected to interrogation, however benign, after counsel had been called and they were awaiting his arrival.

The defendant contends that these incriminatory statements were the product of impermissible custodial interrogation and were, therefore, inadmissible into evidence at the trial. He correctly asserts *Miranda* v. *Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), requires that when an accused informs the police of his desire to see an attorney, all further interrogation must cease, relying on the following language of *Miranda*:

> "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must

cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent." *Id.* at 473-74, 86 S.Ct. at 1627-28, 16 L.Ed.2d at 723.

The Court then went on to make clear that the burden of establishing a waiver of the *Miranda* rights rests upon the prosecution.

"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id.* at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724.

Prior to admitting the testimony of Officer Tempest relating to defendant's statements, the trial justice conducted a lengthy voir dire hearing in the absence of the jury to determine if defendant had voluntarily made the incriminatory remarks. At that hearing Captain Dubuque, Officer Tempest, Gerald Brenner, and defendant testified. Captain Dubuque recounted that he had given defendant the *Miranda* warnings and that defendant said he understood his rights and requested an attorney. After Gerald Brenner was called pursuant to such request, Officer Tempest testified, he took defendant into another office

where they awaited the arrival of Mr. Brenner. He then went on to relate, as set out above, the manner in which defendant made the incriminatory statements. The defendant, however, denied ever making such statements and furthermore claimed that he waited for Mr. Brenner's arrival in the cellblock and that he never made the alleged statements to Officer Tempest. The trial justice, in denying defendant's motion to suppress the introduction into evidence of the statements alleged to have been made by him to Tempest, resolved the only significant factual dispute by concluding that defendant did make the statements to Officer Tempest.

The trial justice concluded that the statements attributed to defendant were made voluntarily, there being no evidence that any coercive pressures had been exerted on defendant to make the statements. Next, the trial justice found that defendant made a valid waiver of his constitutional right. He said: "It seems to me that having been apprised of his rights, having understood them according to his own testimony, and having initiated a conversation with Inspector Tempest, it's perfectly clear that whatever statements he made, they were made knowingly and intelligently waiving his right to remain silent and his right to have counsel at that particular time. Later he refused to sign any written statement or make a formal confession which was his right, but in the informal conversation with Inspector Tempest he knowingly and intelligently waived his rights."

Our review of the record leads to an opposite conclusion from that of the trial justice. We do not believe that the state met its "heavy burden" to demonstrate that defendant knowingly and intelligently waived his privilege against self-incrimination and his right to counsel. The only evidence which at all indicates a waiver is that defendant initiated a conversation with Officer Tempest by indicating

that he was "in a jam." However, such a statement does not constitute a constitutional invitation to the police to commence interrogation. Any individual accused of murder in the custody of the police might express a feeling that he was in serious trouble, whether he were guilty or innocent. A person such as defendant, who has, in addition, a police record and who has, in fact, been seen in a fight with the deceased might certainly remark that he was "in a jam" without such an expression of concern being an admission of guilt. Moreover, a few moments prior to his conversation with Officer Tempest, defendant had emphatically asserted his constitutional rights to remain silent and to consult an attorney. The allegation that he waived those rights was hardly consistent with the conduct of defendant in asserting his rights under the fifth and sixth amendments to the United States Constitution. The fact that defendant initiated a conversation with a police officer does not necessarily indicate either that he changed his mind or expressed a willingness to answer questions without counsel.

The mandate of *Miranda* is clear. An accused has an unqualified right to stop any interrogation and request consultation with an attorney. Once such a request is made, there can be no further questioning until the accused has had an opportunity to consult with a lawyer. *Pierce* v. *State*, 248 Ark. 204, 451 S.W. 219 (1970); *Nasiriddin* v. *State*, 16 Md. App.479, 298 A.2d 490 (1973); *State* v. *Blanchey*, 75 Wash.2d 926, 454 P.2d 841 (1969). In the instant case, defendant requested an attorney and, while awaiting that attorney's arrival, was interrogated by a police officer. The record is devoid of evidence that defendant ever disavowed his request or ever stated that he waived his rights to speak with a lawyer or ever blurted out a confession or ever requested an opportunity to talk to Officer Tempest so he could "clear his chest" or that he

was ever asked by Officer Tempest if he had changed his mind about consulting an attorney. Rather, at a naturally tense moment, when he had been accused of murder and while awaiting the arrival of his attorney, he initiated a conversation with a police officer. On this record, we find insufficient evidence to support a waiver of the rights he so strenuously asserted. We adhere to what the Supreme Court said in *Miranda*: "An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." *Miranda* v. *Arizona, supra* at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724.

Having reached the conclusion that the admission into evidence of the incriminatory statements of defendant to which Officer Tempest testified was error, the conviction must be set aside and a new trial ordered unless it is made to appear beyond a reasonable doubt that such error was harmless. The United States Supreme Court has made it clear that some federally protected constitutional rights are so basic to a fair trial that their infraction can never be treated as harmless error. *Gideon* v. *Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (right to counsel); *Payne* v. *Arkansas,* 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958) (coercion).

On the other hand, in *Chapman* v. *California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Court said that it does not follow that all trial errors which violate the Constitution automatically call for reversal. "At the same time, however, like the federal harmless error statute, it emphasizes an intention not to treat as harmless those constitutional errors that 'affect substantial rights' of a party." *Id.* at 23, 87 S.Ct. at 828, 17 L.Ed.2d at 710. The

Court in *Chapman* adopted the view it had already taken in *Fahy* v. *Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed. 2d 171 (1963), that a determination of whether error is harmless must turn upon whether there is a reasonable possibility that the error complained of contributed to the conviction. The Court went on to say: "An error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot, under *Fahy*, be conceived of as harmless. * * *. [B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman* v. *California, supra* at 23-24, 87 S.Ct. at 828, 17 L.Ed.2d at 710-11. We recognize the merit of the view taken by Mr. Justice Harlan in the dissenting opinion in *Chapman* that the application of the harmless error rule must be used guardedly lest it destroy or dilute constitutional guarantees. *Chapman* v. *California, supra* at 50, 87 S.Ct. at 841, 17 L.Ed.2d at 725.

It is our opinion that the admission of the testimony of Officer Tempest, with its corroborating impact on other evidence adduced through defendant himself, beyond a reasonable doubt contributed to the verdict of the jury and can no more be considered harmless than could the introduction against defendant of a coerced confession. We, therefore, hold that the admission of such testimony was not harmless error, that it substantially eroded defendant's fifth-amendment right as set out in *Miranda,* and that for this reason the judgment of conviction must be reversed and a new trial ordered.

Having concluded that a new trial must be had in this case, we need not pass upon most of defendant's other contentions of error. However, defendant does urge that in-court identifications placing him at the scene of the slaying made by Constance Lataille and Seril Esten violated his constitutional rights. Inasmuch as this issue

might again arise in the course of a future trial, we shall consider its merits.

The defendant argues that the "showup" at the Woonsocket police headquarters where defendant had been exhibited to witnesses while alone was overly suggestive and, therefore, violated the standards of due process prescribed in *Stovall* v. *Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed. 2d 1199 (1967). The record discloses, however, that neither witness testified that he had identified defendant on the basis of the "showup" at the Woonsocket Police Station on the evening of the slaying. Their testimony was limited to observations they had made of Lachapelle at the scene.[1]

The remaining question, therefore, is whether the in-court identifications were tainted by the improper police procedure. In *State* v. *Souza,* 110 R. I. 261, 267, 292 A.2d 214, 217 (1972), we held that an in-court identification may properly be made before a jury even though the pretrial identification was improper. Essentially, we held that the in-court identification was properly admitted when it was based upon observations independent of the identification made at the lineup or confrontation. *State* v. *Beaulieu,* 110 R. I. 113, 290 A.2d 850 (1972); *State* v. *Camerlin,* 108 R. I. 524, 277 A.2d 291 (1971).

When counsel for defendant took over the trial, he moved for a voir dire hearing which would determine the admissibility of the testimony of Mrs. Lataille. While no motion was made with respect to the admissibility of Esten's testimony, the record establishes overwhelming

---

[1]The only reference at trial to the "showup" was made by Captain Dubuque of the Woonsocket Police Department, who testified that both Constance Lataille and Seril Esten identified Lachapelle at police headquarters. However, at no time did defendant move that the reference be stricken.

evidence that Esten's identification was not based on any improper suggestiveness at the showing.[2]

Mrs. Lataille was recalled and cross-examined at the voir dire hearing about the circumstances under which she observed the defendant at the scene of the stabbing. In his decision denying the motion to exclude the identification, the trial justice concluded that Mrs. Lataille had a full opportunity to observe the defendant in the cafe for at least 15 minutes while he talked with Clouette, who was accompanying her. In addition, she had another opportunity to observe the defendant outside the cafe in what was described as a well-lighted street immediately prior to the altercation. After a careful review of the testimony, we find no basis to hold that the trial justice erred in concluding that the state had carried its burden of establishing by clear and convincing evidence that the witness's testimony was based on observations other than those made at the "showup."

The defendant's exception to the admission into evidence of the incriminatory statements alleged to have been made by the defendant at the Woonsocket Police Station on the morning of April 6, 1969, is sustained, all other exceptions of the defendant are overruled, the judgment of guilty is reversed, and the case is remitted to the Superior Court for a new trial within 90 days of the date of the filing of this opinion.

Mr. Justice Joslin did not participate.

*Richard J. Israel,* Attorney General, *Donald P. Ryan,* Asst. Attorney General, *R. Raymond Greco,* Special Asst. Attorney General, for plaintiff.

*William F. Reilly,* Public Defender, *Alton W. Wiley,* Asst. Public Defender, for defendant.

[2]Esten testified that he knew defendant from childhood and carried on an extended conversation with him at the cafe on the evening of Clouette's death.