373 A.2d 150.

STATE *vs.* JOHN E. VARGUS.

APRIL 22, 1977.

PRESENT: Bevilacqua, C.J., Paolino, Joslin, Kelleher and Doris, JJ.

114

BEVILACQUA, C. J. On October 8, 1974, a jury found the defendant, John E. Vargus, guilty of four counts of robbery and possession of a stolen motor vehicle. At his trial in Superior Court, the defendant moved to suppress certain oral statements made by him to a Pawtucket police officer shortly after his arrest, contending that they were obtained in violation of his privilege against self-incrimination. In addition, the defendant moved for a voir dire examination of expert testimony concerning a microscopic hair comparison test that had been performed by a Special Agent of the Federal Bureau of Investigation. The trial justice denied these motions and the defendant appeals.

The facts surrounding this case are not in dispute. On the morning of February 15, 1973, four men wearing dark ski masks robbed the Fairlawn Credit Union. One of the men, later identified as defendant Vargus, was wearing a dark blue trench coat according to testimony of the tellers. After leaving the Credit Union, the four men escaped in a tan-colored automobile which was intercepted by a police vehicle approximately one block from the bank and shortly thereafter crashed into a panel truck. Four men alighted from the automobile and the pursuing police officer continued the chase on foot. At trial the officer testified that he observed a man with a blue three-quarter-length coat and dark trousers fleeing from the automobile and running up Hazel Street.

Meanwhile, another member of the Pawtucket Police Department, who had been alerted by radio broadcasts of

the robbery, proceeded to the vicinity where the suspects were reported to be heading. Arriving at Hazel Street, the officer observed a man wearing a blue coat and lying in a prone position next to a wooden fence. The officer immediately stopped his car, got out, and proceeded to where the man lay. The officer ordered the man to stand up and informed him that he was under arrest as a suspect in connection with the robbery of the Fairlawn Credit Union. After defendant had been escorted back to the parked car the police initiated a cursory search for weapons, but none were found. At that point defendant was apprised of the warnings set out in *Miranda* v. *Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). When asked if he understood these warnings, defendant made no reply.

By now at least two other policemen had responded to the arresting officer's earlier call for assistance and were present at the scene. The defendant was placed in the custody of one of them, Officer Ryan, until he was transferred to a police vehicle for temporary detention. Officer Ryan then proceeded to join the officers who were searching for the other suspects. Before going, however, he had a "second thought"; he returned to the police vehicle and asked defendant the following question: "Before the parties get hurt, both police and your friends, could you tell me if they had weapons?" After hesitating, defendant replied, "Yes, they do have." The officer then asked him if he knew what kind of weapons they had, and defendant answered that he did not know.[1] There was no other conversation between the two men.

A search of the escape vehicle produced a ski mask which was identified at trial as one of the masks used in the robbery. Testimony by a state witness, an expert in micro-

---

[1] Officer Ryan testified that prior to questioning the defendant he was already aware of the fact that at least some of the individuals who robbed the Fairlawn Credit Union had been armed.

scopic analysis, indicated that the hair remnants found in the mask, and samples of hair taken from defendant were microscopically alike and could have originated from the same man.

At trial, the essence of defendant's arguments in support of his motion to suppress was that, because of the atmosphere of compulsion surrounding his detention, any declaration made to Officer Ryan violated the prophylactic rule enunciated in *Miranda* v. *Arizona, supra,* and for that reason should not have been admitted into evidence. Replying to this argument, the trial justice concluded that defendant's declarations were made in response to defensively motivated questions which is not an interrogation in the sense contemplated in *Miranda* and, therefore, that decision was inapplicable. Even if it were,[2] the trial justice felt that the proper procedural safeguards were adhered to: defendant had been apprised of his constitutional rights prior to being placed in the police vehicle — that is, just shortly before being questioned by Officer Ryan; and defendant gave no indication of his unwillingness to respond to the questions asked of him, in effect, waiving his right to remain silent.

We begin our analysis by recognizing that *Miranda's* exclusionary rule is aimed at preserving the individual's privilege against self-incrimination. Thus, procedural safeguards have been enunciated "* * * to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process." *Miranda* v. *Arizona, supra* at 469, 86 S.Ct. at 1625, 16 L. Ed.2d at 721. The issue presented by this aspect of defendant's appeal concerns itself with one or more of these

---

[2]Since the trial justice concluded *Miranda* v. *Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), was inapplicable, he need not have even considered whether by answering Officer Ryan's questions defendant had waived his right to remain silent.

safeguards: Whether the questioning initiated by Officer Ryan while defendant was in custody falls within the rubric of *Miranda*, and if so, whether defendant by his conduct and response waived his constitutional right to remain silent.

The Supreme Court enunciated the following guideline in this respect: "By custodial interrogation we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda* v. *Arizona, supra* at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. *See Orozco* v. *Texas,* 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969); Annot., 31 A.L.R.3d 565 (1970). Here defendant already had been placed under arrest, searched, and confined to a police vehicle for temporary detention.

The *Miranda* decision leaves little doubt in our minds that under these circumstances the statements elicited from defendant were the result of a custodial interrogation. *United States* v. *Hatchel,* 329 F.Supp. 113, 117 (D. Mass. 1971); *State* v. *Lawson,* 285 N.C. 320, 324, 204 S.E. 2d 843, 846 (1974); *State* v. *Dakota,* 300 Minn. 12, 17, 217 N.W.2d 748, 751-52 (1974). The state concedes in its brief that defendant was in custody. Nevertheless, it contends that because the questions were motivated by fears for the public safety and for the safety of the investigating officers they violate neither the letter nor the spirit of *Miranda.* We disagree.

The state cites a number of decisions from other jurisdictions in support of its contention. *People* v. *Mullins,* 188 Colo. 23, 532 P.2d 733 (1975); *People* v. *Toler,* 45 Mich. App. 156, 206 N.W.2d 253 (1973); *State* v. *Lane,* 77 Wash.2d 860, 467 P.2d 304 (1970); *People* v. *Brown,* 131 Ill. App.2d 244, 266 N.E.2d 131 (1970); *Ballew* v. *State,* 246 Ark. 1191, 441 S.W.2d 453 (1969). We note

that the facts in the case before this court are distinguishable. In each of the cases cited by the state, the reviewing court upheld a limited right of an investigating officer to direct questions concerning the presence of dangerous weapons at suspects who posed an actual threat to the officer's immediate physical safety. No such immediate threat to the inquiring officer's physical safety was involved in the instant case. The defendant already had been searched and confined to a police vehicle. Realistically, he was no longer a dangerous risk to the public or other investigating officers.

The trial justice concluded that the examining officer was seeking only to "* * * [maximize] the safety of the police whose obligation it was to apprehend the other persons who were suspects in this robbery." Nevertheless, we are not persuaded that his characterization of the officer's purpose in questioning defendant, initiated while defendant was in custody and posed no immediate threat to the officer or others nearby, suffices to remove it from the scope of *Miranda*. To do so would be to disregard the pressures generated by police custody which can create the impression that the suspect is obligated to answer any questions, a result the *Miranda* Court clearly was attempting to avoid. There is nothing in the language of that decision which would support the trial justice's ruling. On the contrary, in circumstances of this nature its mandate seems clear: When an individual is taken into custody and subjected to questioning, the privilege against self-incrimination is jeopardized. *Miranda* v. *Arizona, supra* at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 726. Thus, it was error for the trial justice to conclude that Officer Ryan's questioning was not an interrogation within the meaning of *Miranda*.

Nothing we have just said, however, would prevent an officer from asking a suspect defensively motivated ques-

tions. But unless the proper procedural safeguards have been adhered to, information received as a result of that questioning will not be admitted into evidence. *See State v. Hudson,* 325 A.2d 56 (Me. 1974).

Having so concluded we must now determine the merit of the trial justice's alternate holding that even if defendant's statements were the result of a custodial interrogation and *Miranda* applied, they were still admissible into evidence since he had voluntarily waived his right to remain silent. Our review of the record leads us to a contrary conclusion.

It is clear that in a case involving the validity of a defendant's decision to forego a right constitutionally guaranteed to protect a fair trial and the reliability of the truth-determining process, any alleged waiver must meet the strict standard of an intentional relinquishment of a known right. *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938); *see Schneckloth v. Bustamonte,* 412 U.S. 218, 236, 93 S.Ct. 2041, 2052, 36 L.Ed.2d 854, 868 (1973). The Supreme Court has asserted that this high standard of proof applies to in-custody interrogation and that the "heavy burden" of establishing such a waiver rests upon the prosecution. *Miranda v. Arizona, supra* at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724.

While it is true in the instant case that defendant was accurately apprised of the *Miranda* warnings, the record is devoid of any indication that defendant acknowledged affirmatively his understanding of those rights. *Contrast People v. Hurlic,* 14 Cal. App.3d 122, 92 Cal. Rptr. 55 (1971) *and Mullaney v. State,* 5 Md. App. 248, 246 A.2d 291 (1968). The testimony of the arresting officer clearly shows that defendant remained silent after being read the *Miranda* warnings. Accordingly, we do not believe that defendant knowingly and intelligently waived his privi-

lege against self-incrimination. *United States ex rel. Williams* v. *Twomey*, 467 F.2d 1248, 1251 (7th Cir. 1972).

The prosecution is not aided by the mere fact that defendant voiced no objection to answering Officer Ryan's questions. The heavy emphasis placed by the trial justice on the fact that "[t]he defendant had given no indication whatsoever of his unwillingness to respond to an interrogation \* \* \*" conflicts directly with the Supreme Court's holding: "An express statement that the individual is willing to make a statement \* \* \* followed closely by a statement could constitute a waiver. *But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.*" *Miranda* v. *Arizona, supra* at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724. (Emphasis added.) *See United States ex rel. Williams* v. *Twomey, supra.* Accordingly, we find that the trial justice failed to apply the proper constitutional standard, i.e., that the prosecution establish defendant's knowing and intentional waiver of his privilege against self-incrimination, before he allowed into evidence incriminating statements made by defendant to Officer Ryan, and that it was error for him to do so.

Having concluded that it was error for the trial justice to deny defendant's motion to suppress and to admit his statements into evidence, we must now determine if, because of this error, the conviction is to be set aside and a new trial ordered.

The Supreme Court has long applied the "rule of automatic reversal" to coerced or involuntary confessions. *E.g., Haynes* v. *Washington*, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); *Payne* v. *Arkansas*, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958); *Malinski* v. *New York*, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029 (1945). The Court has not, however, precisely confronted the situation

in which a statement admitted at trial is inadmissible solely because police interrogators were in violation of *Miranda's* procedural safeguards. Most courts which have considered the issue have applied the "harmless error rule," enunciated in *Chapman* v. *California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). See *e.g., Null* v. *Wainwright,* 508 F.2d 340 (5th Cir.), *cert. denied,* 421 U.S. 970, 95 S.Ct. 1964, 44 L.Ed.2d 459 (1975); *United States* v. *Harris,* 435 F.2d 74, 83 n.21 (D.C. Cir. 1970), *cert. denied,* 402 U.S. 986, 91 S.Ct. 1675, 29 L.Ed.2d 152 (1971); *United States* v. *Richards,* 430 F.2d 1240 (7th Cir. 1970); *United States* v. *Sanchez,* 422 F.2d 1198 (2d Cir. 1970); *State* v. *Lachapelle,* 112 R.I. 105, 308 A.2d 467(1973); *Commonwealth* v. *Padgett,* 428 Pa. 229, 237 A.2d 209 (1968); *People* v. *Doherty,* 67 Cal.2d 9, 429 P.2d 177, 59 Cal. Rptr. 857 (1967). The necessity for the application of these fundamentally differing constitutional rules is that a statement obtained in violation of *Miranda* does not necessarily put in doubt the reliability of the factfinding process as does a statement obtained as a result of a coerced confession. Nonetheless, each may constitute very damaging evidence against the accused, and, accordingly, this court has recognized that "* * * the harmless error rule must be used guardedly lest it destroy or dilute constitutional guarantees." *State* v. *Lachapelle, supra* at 113, 308 A.2d at 471, *citing Chapman* v. *California, supra* at 50, 87 S.Ct. at 841, 17 L.Ed.2d at 725 (Harlan J., dissenting).

The Court in *Chapman,* considering the determination of when a constitutional error is harmless, stated: "An error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot * * * be conceived of as harmless. * * * [B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a rea-

sonable doubt." *Chapman* v. *California, supra* at 23-24, 87 S.Ct. at 828, 17 L.Ed.2d at 710-11. *See Schneble* v. *Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); *Milton* v. *Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972); *Harrington* v. *California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *see also Fahy* v. *Connecticut,* 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963).

In the present case defendant's incriminating admission, in effect constituting a confession of guilt, *see State* v. *Travis,* 116 R.I. 678, 683, 360 A.2d 548, 551 (1976), served to corroborate the circumstantial evidence adduced by the prosecution and, with its persuasive impact on the ultimate fact to be determined at the trial, defendant's guilt or innocence, undoubtedly prejudiced the jury. *Blackmon* v. *Blackledge,* 396 F.Supp. 296, 300 (W.D.N.C. 1975); *Commonwealth* v. *Hosey,* 368 Mass. 571, 579, 334 N.E.2d 44, 49 (1975); *Davis* v. *State,* 159 Ind. App. 580, 308 N.E. 2d 408 (1974); *see Sample* v. *Eyman,* 469 F.2d 819, 821 (9th Cir. 1972). *Contrast Milton* v. *Wainwright, supra.* Examined in this light, and taking into consideration the guarded view of harmless error that we adhered to in *Lachapelle,* we are of the opinion that the admission of Officer Ryan's testimony concerning defendant's statements beyond a reasonable doubt contributed to the verdict of the jury.

In light of this holding, we need not pass upon defendant's other contention that the trial justice committed reversible error when he denied defendant's motion for a voir dire examination of expert testimony regarding a microscopic hair comparison test and proceeded to admit such testimony. However, inasmuch as this issue will undoubtedly arise again in the course of the future trial we shall consider its merits.

The defendant recognizes that the examination of a witness is governed by the sound discretion of the court, the exercise of which will not be interfered with unless it is clearly abused. *State* v. *Robertson,* 102 R.I. 623, 630-31, 232 A.2d 781, 786 (1967); 2 Wharton's *Criminal Evidence* §408 at 288 (13th ed. Torcia 1972). The record discloses that defendant's motion was based upon an alleged need to determine, outside the hearing of the jury, whether the state's expert witness would testify to a scientific certainty that the hairs found in the ski mask were identical to the sample taken from defendant. However, his point is not well-taken since at the hearing the state had stipulated that its expert witness would not so testify. Under these circumstances we cannot say that it was an abuse of discretion for the trial justice to deny the motion.

Notwithstanding this, defendant's final contention is that because of the weight likely to be accorded expert testimony by a jury, an expert must be able to testify to a reasonable scientific certainty or high probability before his testimony will be admissible in evidence. The defendant places great reliance on *State* v. *Vaccaro,* 111 R.I. 59, 298 A.2d 788 (1973), in support of this proposition. We disagree, however, with his interpretation of that case.

This court has consistently recognized that in matters beyond the ken of the jury expert testimony may be admitted in order to aid it in its search for the truth. *E.g., Morgan* v. *Washington Trust Co.,* 105 R.I. 13, 17-18, 249 A.2d 48, 51 (1969). No talismanic standard can be established, however, to delineate the host of subjects which admit of expert testimony; instead, the trial justice will be given wide discretion in making this determination. *State* v. *Capone,* 115 R.I. 426, 435, 347 A.2d 615, 620-21 (1975); *State* v. *Andrews,* 86 R.I. 341, 350-51, 134 A.2d 425, 431 (1957). In *Andrews,* a medical doctor

was allowed over objection to give his opinion, based on microscopic comparison, that sample hairs taken from the defendant and those found near the victim had originated from the same source. On appeal we condoned the use of an expert witness under those circumstances and concluded that his testimony was properly admissible since identification by hair comparison is something he was better able to perform than the jury. *C f. Acrey* v. *Commonwealth,* 312 Ky. 732, 229 S.W.2d 748 (1950).

Similarly, in the instant case testimony by the state's expert witness was properly admitted. The defendant's contention that a later decision, *State* v. *Vaccaro, supra,* compels a different result is misguided. In that case we were not introducing a new standard, a high probability as the defendant alleges, by which the admissibility of expert testimony is determined. The degree of conclusiveness which characterizes the testimony of a witness, properly qualified to give his opinion as an expert, goes only to the weight and not the admissibility of the evidence. *State* v. *Wilson,* 217 La. 470, 46 So.2d 738 (1950), *aff'd,* 341 U.S. 901-02, 71 S.Ct. 611, 95 L.Ed. 1341 (1951). In consonance with this approach we have held that the jury is always free to accept, to reject, or to accord any amount of weight it chooses to the expert's testimony. *State* v. *Vaccaro, supra* at 66, 298 A.2d at 792. Thus the trial justice's denial of defendant's motion for a voir dire and his admission into evidence of expert testimony were proper.

The defendant's exception to the admission into evidence of the incriminating statements alleged to have been made by the defendant to Officer Ryan is sustained, all other exceptions of the defendant are overruled, the judgment of guilty is reversed, and the case is remitted to the Superior Court.

Mr. Justice Kelleher, with whom Mr. Justice Joslin joins dissenting. A reading of the five-volume transcript in this case brings to mind the tale told by Jimmy Breslin in his novel, *The Gang that Couldn't Shoot Straight*. The record before us could furnish Breslin with sufficient material to write a sequel, which might be entitled: *The Credit Union Caper that Never Came Off*.

*Miranda,* custodial interrogation and waiver to one side, it is my belief that even assuming that the trial justice erred when he allowed Officer Ryan to give the jury Vargus' description of the armed status of his friends, such error, even though of constitutional proportions, was harmless. The harmless error standard requires that a court be able to declare that a constitutional error was harmless beyond a reasonable doubt. *Chapman* v. *California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). If, upon its reading of the trial record, the appellate court is firmly convinced that the evidence of the accused's guilt was overwhelming and that the trier of fact would have reached the same result without the evidence procured in violation of the *Miranda* rule, the conviction will stand. *Null* v. *Wainwright,* 508 F.2d 340 (5th Cir. 1975), *cert. denied,* 421 U.S. 970, 95 S.Ct. 1964, 44 L.Ed. 2d 459 (1975); *United States* v. *Harris,* 435 F.2d 74 (D.C. Cir. 1970), *cert. denied,* 402 U.S. 986, 91 S.Ct. 1675, 29 L.Ed.2d 152 (1971); *United States* v. *Hill,* 430 F.2d 129 (5th Cir. 1970); *United States* v. *Jackson,* 429 F.2d 1368 (7th Cir. 1970); *see Milton* v. *Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972); *Harrington* v. *California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

The only evidence presented in this case was that of the prosecution. The transcript indicates that within seconds after the robbers entered the credit union, the Pawtucket Police Department was well aware that a holdup was in progress. The manager of the credit union was

seated in his office when two of the robbers, including one who was wearing a three-quarter-length dark coat, leaped over the counter. When the manager saw the robbers, he pressed a concealed button, which in turn sounded the alarm at police headquarters. In the meantime, the gunman wearing the three-quarter-length coat terrorized two of the tellers.

James Ribeiro is a first-floor tenant in a multifamily dwelling that is directly across the street from the credit union. At approximately 9:30 a.m. on the day of the holdup, he was about to make a telephone call. His phone is located near the front room's bay window. As Ribeiro picked up the phone and looked out the window, he saw what he thought were "four school kids" enter the credit union building. The "kids" were wearing ski masks and carrying guns. When Ribeiro realized what was going on, he called the operator, who in turn put him in direct contact with the Pawtucket police. He then began to give a blow-by-blow account of what was happening across the way. Among other things, he described the color of the robbers' car and the direction they took as they made their departure.

As the holdup began, Patrolman Dino DeLuca was on duty in radio car No. 6. He was on Mineral Spring Avenue near the intersection of Columbia Avenue, just a few blocks southeast of the credit union. When De-Luca received the initial radio report of the ongoing holdup, he turned from Mineral Spring on to Columbia Avenue and proceeded north to Samuel Avenue. He turned left on Samuel and proceeded in a westerly direction toward Smithfield Avenue and the credit union. De-Luca was within a block of the credit union when he observed a tan car with a white-haired driver traveling at a slow rate of speed on Samuel Avenue. The officer drove into a nearby parking lot, turned around, and re-

turned to Samuel Avenue. At this point he was traveling east. As he came up to the rear of the tan car, he noticed that three heads "popped up" in the back seat. The white-haired driver began to accelerate, and the chase was on. As the tan car darted out of Samuel Avenue on to Weeden Street, it struck the rear of a panel truck heading east on Weeden. When DeLuca came upon the collision, he saw four men jump out of the tan car and begin to run in various directions. One headed south and the other three headed north. One of the trio, the one with the three-quarter-length coat, was running north along Hazel Street. The other two ran alongside a gas station that was situated on the northerly side of Weeden Street somewhere between Elder and Hazel Streets. Elder and Hazel Streets are parallel to each other. DeLuca stopped his cruiser behind the disabled and abandoned vehicle and began to chase the two fugitives who had taken off toward the gas station. One of the fugitives turned, pointing a gun at DeLuca. The officer fired and in the subsequent turmoil lost track of the two who were then running through the backyards of property that fronted on Elder Street. DeLuca returned to his vehicle and radioed headquarters about the three that were headed north.

Lieutenant, then Sergeant, John Cordoni, who was at headquarters when the alarm first sounded, was traveling in an unmarked cruiser heading toward the holdup area when he heard DeLuca refer to Hazel Street. He headed toward that specific area, and as the sergeant was traveling along Hazel Street, he observed a "subject" lying face down in the mud alongside a fence some 30 to 45 feet east of the easterly curbstone of Hazel Street. Sergeant Cordoni stopped his vehicle and apprehended the prone "subject," who was wearing a three-quarter-length blue jacket.

After DeLuca heard Cordoni radio the news of his ap-

prehension of the muddied "subject," DeLuca went to Hazel Street and, upon seeing the "subject," said: "Hey, Sergeant, that's one of the guys I was chasing."

The arrest occurred just about 10 to 15 minutes after the robbers had made their entrance at the credit union. Shortly after the arrest, the police entered an Elder Street garage, where they found some guns and a bag full of money. Later, when the "subject" was taken to the Pawtucket Police Station, he complained of chest pains, and Sergeant Cordoni transported him to the Pawtucket Memorial Hospital for treatment. When asked to identify himself, the "subject" gave a fictitious name and informed the police that he lived in Cambridge, Massachusetts. Subsequent investigation disclosed that the tan car was a 1972 Oldsmobile that had been stolen 3 days earlier from a Cambridge, Massachusetts parking lot. After all the physical evidence was assembled and inventoried, the police discovered that when the robbers appeared at the credit union, they were equipped with a .38 caliber pistol, a magnum revolver, a magnum rifle, a modified army carbine rifle, and a shotgun. All weapons were loaded and operable. The bag left at the collision scene contained $9,225, and the bag found in the garage contained $37,750. When the police counted the contents of the bag, they found the credit union's "bait money." This is a term that is applied to a certain amount of bills that are marked and placed in each teller's drawer. In the event of a robbery, the teller includes the bait with all of the cash that is surrendered to the robbers.

As noted before, the record indicates that the time span from the entry of the robbers into the credit union to the Hazel Street arrest was at the most 15 minutes. A sketch prepared by and used by the witnesses at the trial indicates that the holdup, the automotive chase, the collision, the foot chase, the capture, and the recovery of

the guns and cash all occurred within 3 to 4 blocks of one another. When the case went to the jury, the jurors were presented with one simple question to resolve. It was: Having in mind all the facts detailed in this dissent, what was Vargus doing some 10 to 15 minutes after the holdup began wearing a three-quarter-length dark blue jacket and lying on his stomach in the road some 40 to 50 feet to the rear of the easterly curb line on Hazel Street?

It may be that he was a lover of nature who was down at ground level attempting to determine if spring's first crocus had poked its head through the soil. If the jury wanted to engage in similar flights of fancy, it could come up with any number of fanciful theories to account for his presence and his posture and clothing in that particular area minutes after the holdup had taken place. Actually, the jury, in using its common sense, arrived at the only reasonable inference that could be drawn from the evidence of the state's witnesses exclusive of Officer Ryan. It is obvious that Sergeant Cordoni's "subject," having jumped out of the abandoned and crumpled getaway car, was attempting to hide from his pursuers.

This court has declared that there is no valid distinction to be drawn between the probative force of direct and circumstantial evidence. Any fact, we have said may be established by circumstantial evidence as sufficiently and completely as by positive direct evidence. *State* v. *Rose,* 112 R.I. 402, 407, 311 A.2d 281, 284 (1973). We have also pointed out that while the prosecution, in presenting its case, is bound to prove the guilt of the accused beyond a reasonable doubt, it is not required to establish proof beyond all doubt. *State* v. *Murphy,* 113 R.I. 565, 573, 323 A.2d 561, 565 (1974). A reasonable doubt has been defined as an actual and substantial doubt arising from the evidence or the lack thereof as distinguished from a mere suspicion, apprehension, or imaginary doubt. *State* v.

*Mantia,* 101 R.I. 367, 375-76, 223 A.2d 843, 848 (1966). Consequently, my review of the record shows a super-abundance of untainted evidence which convinces me beyond a reasonable doubt that Officer Ryan's testimony[1] in no way contributed to the jury's verdict.

Parenthetically, in light of the amount of untainted evidence in the record, one wonders why the prosecutor placed Ryan's conversation before the jury. Prosecutors must refrain from such practices. But such practices will not require reversal where, as in this case, the record is replete with evidence satisfying our harmless error rule. *United States* v. *Jackson,* 429 F.2d 1368, 1373 (7th Cir. 1970).

*Julius C. Michaelson,* Attorney General, *Judith Romney Wegner,* Special Asst. Attorney General, for plaintiff.

*William F. Reilly,* Public Defender, *Richard M. Casparian, Bruce G. Pollock,* Asst. Public Defenders, for defendant.

---

[1]The trial justice, in ruling on the admissibility of Ryan's conversations, first took the position that the officer's encounter with Vargus was not a custodial interrogation within the contemplation of *Miranda* v. *Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). There is a line of cases which holds that inquiries such as that posed by Officer Ryan do not come within the *Miranda* rule because their purpose was not to gather proof but rather to protest the public and the police. However, when the trial justice charged the jurors, he pointed out to them that before they could consider Ryan's testimony, they would first have to find that the *Miranda* warnings had been given and thereafter Vargus made a knowing, intelligent, and voluntary waiver of his constitutional rights. Since this is the law of the case, I forego any discussion of whether Ryan's questions were motivated by his concern for the safety of the fugitives, the public, and the police. While the majority points to the fact that Vargus, while in custody, was not an immediate threat to the police, once Officer Ryan left Vargas to join the pursuit, he was engaging in a chase that began when one of those being pursued had pointed a weapon at Officer DeLuca. It may very well be that if there is a so-called public safety exception to *Miranda,* Officer Ryan's conversation could have been sustained on that basis. It is obvious that Officer Ryan was interested in self-preservation rather than self-incrimination.