STATE

v.

Matthew AGIN.

No. 86–294–C.A.

Supreme Court of Rhode Island.

Jan. 14, 1988.

James E. O'Neil, Atty. Gen., Thomas Dickinson and Jane M. McSoley, Asst. Attys. Gen., for plaintiff.

William Reilly, Public Defender, Barbara Hurst and Paula Rosin, Asst. Public Defenders, for defendant.

## OPINION

KELLEHER, Justice.

A Superior Court jury has returned four guilty verdicts against the defendant, Matthew Agin (Agin), who was charged in a four-count indictment with commission of a burglary, first-degree sexual assault, assault with intent to rob, and assault on a person over sixty years of age.

The sequence of events leading to the convictions began on January 6, 1985, when at approximately 1:45 a.m. the Coventry police department responded to a telephone complaint from a seventy-six-year-old widow who reported that she had just been raped and beaten by an intruder who continually demanded that she tell him the location of her money.

The first officer to respond to the call was Officer Mark Turco. When Officer Turco (Turco) arrived at the complainant's home, he observed external signs of forced entry as well as footprints in the snow. As he viewed the pattern of the footprints, he noticed that the design of the print matched that of the soles of the Pro-Keds sneakers he wore as a high school student. Turco then used his portable radio to inform others who might be responding to the complaint to be on the watch for a pedestrian who was wearing sneakers.

At approximately 2:15 a.m., Edward Ferrerra (Ferrerra), a member of the West Warwick police department, was directed by his superiors to proceed to the area of the West Warwick-Coventry town line to join in the search for a suspect who was wanted for a "house-break." As Officer Ferrerra drove toward the town line, he observed a "subject" walking in the middle of New London Turnpike and heading toward West Warwick. The officer stopped his cruiser, approached the subject, and asked for identification. The pedestrian,

who was wearing sneakers, produced identification indicating that he was Matthew Agin. He told the officer that his car had broken down and asked Officer Ferrerra for a ride home. Officer Ferrerra then made a pat-down search of Agin, which uncovered a can of beer. Agin was placed in the back of the cruiser, and its operator then proceeded toward Coventry. About 100 yards from the breaking-and-entering and assault scene, they came upon Agin's vehicle, which at that time was surrounded by members of the Coventry police.

Upon the arrival of daylight, the victim's son-in-law made an inspection of his mother-in-law's premises. In the process he found a set of automobile keys lying in the snow near a broken cellar window. At this time Agin's car had been impounded. When a police officer entered the vehicle and placed one of the keys in the ignition switch, he turned the switch, and the motor responded.

Other witnesses for the prosecution included three specialists from the Federal Bureau of Investigation (FBI), who informed the jury of the results of tests that had been made on various materials sent to the FBI for analysis. A plaster cast of a footprint discovered at the scene was sent to the FBI. Various items of the victim's belongings were analyzed, including a green blanket.

The defense presented no evidence.

Agin's appellate counsel presents a three-faceted appeal. One facet relates to the charge to the jury relative to the charge of assault with intent to commit robbery; another facet concerns the trial justice's refusal to pass the case because of certain remarks made by the prosecutor in his opening statement to the jury; and the third facet challenges the testimony given by one of the FBI experts.

Counsel for Agin has argued before us that the trial justice erred because of his failure to tell the jury that it was necessary for the state to prove that Agin, at the time he entered the premises, intended to deprive the septuagenarian of her money permanently. In *State v. Robalewski*, 418 A.2d 817 (R.I.1980), this court emphasized that when the charge is robbery, the jury must be told of the necessity on the part of the prosecution to present evidence that would indicate that the perpetrator intended to deprive the victim of his or her property permanently.

■ However, no robbery took place in Coventry. There was no taking. The charge lodged against Agin was the commission of an assault with intent to commit a robbery. Speaking of this crime in *State v. Fournier*, 448 A.2d 1230 (R.I.1982), this court emphasized that an assault-with-intent-to-rob charge requires proof that the defendant unlawfully attempted to take from the person of another goods or money of any value by violence or by putting him or her in fear. Consequently we noted that the crime was committed in that case when the defendant pointed a gun at his victim and demanded money. What was said in *Fournier* applies equally well to Agin. There is a difference in proof when the charge is the substantive crime of robbery rather than, as in this case, assault with intent to commit a robbery that was never effectuated.

In his charge to the jury, the trial justice emphasized that in order to return a guilty verdict on the sexual-assault charge, the state was required to prove that the intruder was Agin, who by the use of force or coercion, engaged in vaginal penetration of the victim.

■ Before us Agin's appellate counsel faults the trial justice for his failure to define such terms found in the first-degree-sexual-assault statute as "penetration" or "force" or "consent." We see absolutely no prejudice to Agin's cause. We have no doubt that all the members of the jury were individuals who had long ago abandoned any belief in the "birds and the bees" theory of procreation. Once the seventy-six-year-old victim appeared on the witness stand and told, in very simple and direct language, that there was vaginal penetration that was accomplished through the use of force and fear, the jury was extremely cognizant of what occurred once Agin entered the victim's bedroom. The

guilty verdicts returned by the jury were a most appropriate response to the evidence produced at trial.

At the beginning of the actual trial, counsel for the state made an extensive opening statement that comprised eleven pages of the transcript. In the midst of his presentation, the prosecutor told the jurors that they could expect to hear from the nursing supervisor at the Adult Correctional Institutions (ACI), who would testify that, in compliance with a court order, he had taken a blood sample from Agin in March that was subsequently sent to the FBI laboratory for analysis by one of its specialists. At the conclusion of the statement, Agin's trial counsel made a motion to pass the case because of the prejudicial nature of the state's reference to the ACI.

In rejecting the motion to pass, the trial justice indicated a willingness to give a cautionary instruction if defense counsel so wished. Defense counsel refused the offer, expressing the belief that such an instruction would do nothing more than highlight the jury's attention to the fact that a sample of Agin's blood had been taken while he was at the ACI.

Decisions on motions to pass on issues presented to the trial court will not be disturbed by this court unless the action taken was clearly wrong. *State v. Brown*, 528 A.2d 1098 (R.I.1987). Here, the mere mention of the ACI was, in our opinion, insignificant. The trial had not begun, and no evidence had been taken. Admittedly there may be instances when a trial justice may be required to give a cautionary instruction that will hopefully remove "the taint represented by the enveloping smoke of a criminal record." *State v. Costa*, 111 R.I. 602, 610, 306 A.2d 36, 40 (1973). Here there was no taint to remove. In fact, in this case, the state's evidence relating to Agin's guilt concerning all charges was overwhelming. Not many intruders have

the misfortune to wear Pro-Keds sneakers[1] on a snowy night and lose the keys to their get-away vehicle before leaving the scene of the crime.

At trial another FBI specialist testified regarding a fiber analysis performed on defendant's clothing as well as personal items belonging to the victim. The specialist testified that while testing the articles of clothing belonging to Agin, he kept finding certain green synthetic fibers. The Coventry police were contacted, and a green blanket from the victim's bedroom was forwarded to the bureau. At trial, after being asked to give his opinion based on reasonable scientific certainty about whether the fibers on Agin's clothing came from the victim's blanket, his response was that they "could have." He then explained that he could not speak in terms of absolute certainty, emphasizing that there were other blankets in this world whose composition are similar to the one supplied him by the Coventry police.

In *State v. Brennan*, 526 A.2d 483, 488–89 (R.I.1987), we noted that the identical response was first challenged in *State v. Vargus*, 118 R.I. 113, 373 A.2d 150 (1977). The challenge was rejected in both instances because the degree of conclusiveness with which a duly qualified expert testifies goes only to the weight, rather than to the admissibility, of the evidence. Thus, the trial justice did not err when he overruled Agin's objection to the expert's response.

The defendant's appeal is denied and dismissed. The judgments of conviction appealed from are affirmed.

---

**1.** At trial an FBI specialist told the jury the result of his study of the plaster cast of the footprint. A comparative study of the footprint plaster cast and the sneakers belonging to Agin revealed that the print and the pattern of the sole of Agin's right sneaker were a perfect match.