**STATE**

v.

**JOSE DeJESUS.**

No. 2006–193–C.A.

Supreme Court of Rhode Island.

May 29, 2008.

---

Jane M. McSoley, Esq., Providence, for Plaintiff.

Janice M. Weisfeld, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

"Who knows himself a braggart, Let him fear this[,] for it will come to pass[,] That every braggart shall be found an ass." [1] The defendant Jose DeJesus [2] appeals the judgments of conviction for murder (count 1), first-degree robbery (count 2), discharging a firearm during the commission of a crime of violence with death resulting (count 3), carrying a pistol without a license (count 4), and possessing a firearm after a previous conviction for a crime of violence (count 5).

On April 11, 2003, Mauricio Flores, the operator of a small family business in the Mount Pleasant section of Providence, was shot in the face during the robbery of his store, the Flores Market. The robber escaped with a few hundred dollars. Mauricio's wife, Teresa Flores, also was working in the store at the time of the robbery; she made a hysterical 9–1–1 call to seek help for her mortally wounded husband. Tragically, Mauricio died from his wounds one hundred seven days later.

Law enforcement's attention eventually focused on defendant, and he became a suspect after an unnamed local youth informed Philip Hartnett, the investigating detective, that a homosexual Hispanic male with blond hair was bragging in the neighborhood about having committed the robbery. While defendant was incarcerated

---

1. William Shakespeare, All's Well that Ends Well act 4, sc. 3.

2. DeJesus testified at trial that his real name is Eduardo Gonzalez, and he also has used the alias Jorge Burgos; however, to maintain consistency we will refer to him as DeJesus.

on unrelated charges, Thomas Viera, DeJesus' cellmate, acted as an informant for the police and recorded defendant boasting as he described the gruesome details of the crime. The defendant's braggadocio proved to be instrumental in his downfall.

For the reasons stated in this opinion, we affirm the judgments of conviction.

## I

### Facts and Procedural History

At approximately 2:30 p.m., Mauricio Flores was working behind the register at the Flores Market while his wife, Teresa, was pricing and stocking merchandise in an aisle of the store. Teresa, whose view of the front of the store was blocked by the aisles of merchandise, testified that she heard her husband call out, "Terri, un asalto [sic]." [3] She testified that this cry was followed by noises and the sounds of gunshots. Teresa testified that she was paralyzed by fear and so she stayed in her place, until the gunman found her and placed the weapon next to her head.

The gunman next walked Teresa to the register, past the ever-widening pool of her husband's blood. The robber demanded that she open the register and that she give him all the money that was inside. After she complied, he demanded to know where she kept her jewelry and where the security camera was located. She testified that she told the robber that she had no jewelry to give him and that the camera only monitored the store, but that it was incapable of recording. At trial, Teresa testified that he spoke to her in both English and Spanish. Finally, the gunman pushed her into the rear of the store and out its back exit before he fled into the street.

Teresa testified that she rushed to the couple's second-floor living quarters and called 9–1–1. Speaking in Spanish, she informed the operator that her husband was dying and she begged for assistance. Teresa then returned to the store and to her husband's side. A few minutes later, a customer entered the store and they both endeavored to assist Mauricio with his wounds.

As soon as the police and an ambulance arrived, Teresa described the robber to the police as a "white male" who was unshaven for about three days. She said that he was five feet, six-inches tall, very skinny, that he had a skinny face and pointy nose, and was approximately thirty-two years old. She noted that he wore a baseball cap and an olive green coat. However, she was unable to identify the assailant from the numerous photographs the police showed her.[4] At trial, Teresa, a Hispanic woman, testified that the robber had the same complexion as hers and that he spoke to her in Spanish during the robbery. Significantly, she did not tell the police that the robber was Hispanic or that he spoke Spanish to her when she talked to law enforcement just after the robbery.

At the crime scene, the police found a machete on a shelf near the counter. Teresa testified that her husband used the machete to cut coconuts and that he kept it behind the counter. Detective Hartnett

---

**3.** Terri is short for Teresa, and the quoted words were translated during trial into English as Mauricio saying, "Terri, a robbery." We note that both Teresa and DeJesus were provided with a Spanish interpreter during trial.

**4.** DeJesus' first trial ended in a mistrial after Teresa testified that she was able to identify defendant as the man who shot her husband in the face. The defense immediately moved for a mistrial and the state acknowledged that there was no possible way the witness positively could identify the assailant and interposed no objection to the motion to pass.

testified that he spoke with Maria Pena, a woman who had been seated in a parked car outside the Flores Market at the time of the robbery. Pena testified that she had heard several gunshots, and then she saw a light-skinned blond man, who shoved something black down the back of his pants, come out of the Flores Market. Pena said that once the blond man came outside, he met with a black man who had been waiting outside, pacing back and forth with his black hood drawn up, and that she attempted to follow them as they left the scene together. Pena also was unable to identify the robber, although she was shown numerous photographs. After the police arrived and the scene was secured, Pena was amidst a growing crowd of onlookers from the neighborhood who assembled outside the store. Pena testified that from the outside of the store she could see the machete on the floor by the counter.

Some time after the shooting, Det. Hartnett spoke with a local youth who said that he had heard a homosexual Spanish male with blond hair bragging about shooting Flores, and that the incident involved a machete. Detective Hartnett sent out a department-wide e-mail seeking further information. His resourcefulness was rewarded when a member of the department provided the name of defendant, who then was incarcerated at the Adult Correctional Institutions (ACI) on unrelated domestic-assault charges against his same-sex domestic partner.

Detective Hartnett testified at a pretrial hearing and during trial that he first met with defendant at the ACI and that defendant had dyed-blond hair and a heavy Hispanic accent.[5] The detective testified that he first ensured that DeJesus understood English and then he read the rights outlined in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) to defendant from a standard preprinted form, although he did not have him sign the form. He testified that defendant watched him intently, used his hands in an animated fashion, and informed the detective that he understood his rights. Detective Hartnett then told DeJesus that he was investigating a robbery, and that defendant replied that he "would cooperate one hundred percent with police, [but] that he had nothing to do with any robbery."

Detective Hartnett testified that he told DeJesus that the robbery took place on Academy Avenue and, in an effort to put DeJesus at ease, also told him that the shooting was the likely result of self-defense. Detective Hartnett testified that he did not mention the machete to DeJesus and that DeJesus never requested counsel during this interview.

At a pretrial hearing, held in response to defendant's motion to suppress recorded statements made by DeJesus and his cellmate, DeJesus testified to a very different version of events. He testified that when he first spoke with Det. Hartnett, the detective did not read him his rights. DeJesus testified that Det. Hartnett told him that he knew he had committed the robbery and homicide on Academy Avenue and that he also knew that after Mauricio brandished the machete, that defendant shot him in the face to protect himself. DeJesus testified that after listening to Det. Hartnett's story about the robbery, he admitted to telling the detective that he would be happy to help him, but that he had no information to offer. DeJesus then claimed that he requested "legal assis-

---

**5.** Detective Hartnett said that he was surprised at DeJesus' pronounced Hispanic accent because Mrs. Flores had told him that the robber spoke English and was a "white male."

tance." However, after concluding the hearing, the hearing justice said that he believed Det. Hartnett's testimony that DeJesus did not ask for counsel, and he rejected DeJesus' testimony that he had made such a request.

After meeting with DeJesus, Det. Hartnett testified that he met with an ACI investigator and Thomas Viera, an inmate at the ACI who worked with defendant in the prison's kitchen. As a result of this meeting, Viera, who had served as an undercover operative for the police in the past, agreed to record conversations between himself and DeJesus, and to encourage defendant to talk about the robbery.

Viera wore a wire while sharing a cell with defendant. Viera questioned defendant on committing robberies generally and then continued to question DeJesus on the Flores robbery in particular. He asked defendant many questions, including how DeJesus executed the robbery, whether he harmed the woman in the store, and how much money he was able to steal. Viera also offered his own experiences and opinions on committing robberies, and he shared the personal experiences he had with Mauricio Flores, a man that he knew. However, the majority of Viera's verbiage consisted of questions encouraging DeJesus to divulge the details of the Flores Market robbery.

Eventually, Viera was successful in obtaining recorded information from DeJesus about the robbery.[6] The defendant boasted to Viera that he had entered the store wearing a baseball cap drawn low to disguise his face and that he had stopped shaving his face for a couple of days before the robbery. DeJesus said that although he entered the store armed with a .45–caliber handgun, the firearm was not loaded because he did not insert the ammunition clip. DeJesus related that it was only after Mauricio went for a machete and he had warned someone in the back of the store to get the police that he had inserted the clip into the weapon and shot Mauricio in the face. The defendant then told Viera that he forced a woman who was hiding in the back of the store to walk to the front of the store and open the register.

In the recorded statement, DeJesus described Teresa as "religious" and he expressed uneasiness over the incident because "[he] grew up religious," too. He explained that he "got the lady in [his] head" and in a high-pitched voice, DeJesus mimicked her panicked voice saying, "oh my God," before telling Viera that he told Teresa to "open the f* * *in thing up or I'll blow you f* * *in head off too." He told Viera that he harvested $600 from his criminal venture.[7]

During the pretrial hearing, DeJesus argued that his recorded statements, and the transcript of those statements, should not be admitted into evidence at trial because of his earlier request for legal assistance. The defendant also argued that admitting Viera's statements into evidence would violate his right to confrontation under the Sixth Amendment to the United States Constitution because Viera had died from a drug overdose before trial and he could not be cross-examined. As an alternative, defense counsel argued that the state should redact Viera's statements from the recording. The hearing justice disagreed and ruled that the entire recording, containing both DeJesus' and Viera's statements, would be played for the jury.

At the pretrial hearing, and again during trial, DeJesus testified that he did not commit the crime but that he only had

---

**6.** The recorded conversation between Viera and DeJesus was in English.

**7.** Teresa testified that she believed approximately $400 was taken.

"imagine[d]" the version of events that he told Viera in order to impress him. He testified that he decided to brag about being a murderer and robber to Viera and "lots of people" at the ACI because he thought it would help his situation, as well as the situation of his transsexual partner, who also was incarcerated. He said that the other inmates were verbally abusing both him and his partner. The defendant testified that if they believed him to be a murderer, he would gain their respect. He denied his involvement in the robbery, and he testified that he merely repeated facts that Det. Hartnett had told him or facts that generally were known about the robbery in the neighborhood.[8]

Detective Hartnett testified that soon after DeJesus made these statements to Viera, DeJesus was arraigned on the robbery charge and, because Mauricio had died from his wounds, also on a charge of murder. Detective Hartnett further testified that he introduced himself again to DeJesus when defendant was brought to the District Court for arraignment, and he informed DeJesus that he was investigating a robbery and homicide. He then informed DeJesus of his rights, but again did not have him initial the form, even though the standard form had spaces to fill in a defendant's initials. Detective Hartnett testified that DeJesus sat down with him and that, as before, he denied any involvement in the robbery. The detective said that defendant increasingly became agitated, banged the desk, said "[t]his is bullshit," and then pounded on the door for the marshal to let him out.

During DeJesus' trial, the trial justice admitted into evidence the first half of Teresa's first phone call to 9–1–1 over defendant's objection.[9] The defendant argued that the admission of the tape of the call was unfairly prejudicial and irrelevant, and that it should have been excluded pursuant to Rule 403 of the Rhode Island Rules of Evidence.[10] However, the trial justice agreed with the state that the evidence was relevant because the call included facts very similar to those that defendant later would recount to Viera. Although the robber was not present at the time of the 9–1–1 call, there was a close temporal proximity to when the robber and Teresa were together and it showed Teresa's "religious" response to the event, just as DeJesus later would describe her in his response to Viera.

At trial, the court interpreter translated Teresa's words from the 9–1–1 call from Spanish into English for the jury. On the recording, amidst trying to explain that her husband had been shot by a robber, Teresa repeated the words "Blessed God, Blessed God, Blessed God; my husband is dying. Glorious God. Glorious God. Blessed God."[11]

---

**8.** The defendant lived about a half mile from the Flores Market. A *Providence Journal* article, which was admitted into evidence, also revealed that Mauricio was robbed. In addition, defendant elicited testimony on cross-examination that the robbery was broadcast on the news, and that people in the neighborhood (Pena, specifically) saw the machete in the store after the robbery.

**9.** There were four calls made in total.

**10.** Rule 403 of the Rhode Island Rules of Evidence provides in full:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

**11.** During trial, the state had DeJesus translate Teresa's 9–1–1 call. He replied: "She was screaming in Spanish, 'Oh my God; oh, my God,' things of that nature."

After beginning its deliberation, but prior to reaching a verdict, the jury requested to hear the 9–1–1 tape and the portion of the jailhouse recording in which DeJesus mimicked Teresa. After listening to this evidence twice, the jury returned to deliberate, subsequently convicting DeJesus on all counts of the indictment. DeJesus was sentenced to two terms of life imprisonment for counts 1 and 2, to run concurrently, and a consecutive life sentence for count 3, as required by G.L.1956 § 11–47–3.2(b)(3) and (c),[12] and two ten-year terms that would run concurrently, for counts 4 and 5.

The defendant raises four issues on appeal. DeJesus argues that (1) the trial justice erred in admitting DeJesus' recorded statements to Viera in violation of the Fifth and Fourteenth Amendments to the United States Constitution, and article 1, section 13, of the Rhode Island Constitution; (2) the admission of Viera's recorded statements to DeJesus violated defendant's right to confrontation, under the Sixth and Fourteenth Amendments to the United States Constitution, and article 1, section 10, of the Rhode Island Constitution; (3) Teresa Flores' 9–1–1 call should not have been played to the jury because it was irrelevant and unfairly prejudicial; and (4) § 11–47–3.2(b)(3) and (c), which specify a mandatory consecutive life sentence on the charge of discharging a weapon during the commission of a crime of violence resulting in death, violate the Equal Protection Clause, the Double Jeopardy Clause, and constitute cruel and unusual punishment.

## II

### DeJesus' Request for "Legal Assistance"

DeJesus argues that the trial justice erred when he admitted defendant's recorded statements into evidence and that such evidence should have been excluded because, according to him, he had requested "legal assistance" from Det. Hartnett at their first meeting and all further interrogation was prohibited. *See State v. Travis,* 116 R.I. 678, 681, 360 A.2d 548, 550 (1976) (holding that once the defendant requested an attorney, his statements made to an undercover police officer in his jail cell were inadmissible). Therefore, defendant contends that the subsequent undercover interrogation by Viera (who the state concedes was an agent of the police), contravened his rights against self-incrimination under the Fourteenth Amendment to the United States Constitution and *Mi-*

---

12. General Laws 1956 § 11–47–3.2 states in relevant part:

"(a) No person shall use a firearm while committing or attempting to commit a crime of violence. * * *

"(b) Every person who, while committing an offense violating subsection (a) of this section, discharges a firearm shall be guilty of a felony and be imprisoned as follows:

"(1) Ten (10) years, if no injury to any other person results from the discharge;

"(2) Twenty (20) years, if a person other than a police officer is injured by the discharge of the firearm, or if a police officer who is engaged in the performance of his or her duty is deliberately endangered by the person's discharge of the firearm; and

"(3) Life, if a police officer who is engaged in the performance of his or her duty is injured by the discharge of the firearm, or if the death or permanent incapacity of any person (other than the person convicted) results from the discharge of the firearm.

"(c) The penalties defined in subsection (b) of this section shall run consecutively, and not concurrently, to any other sentence imposed and, notwithstanding the provisions of chapter 8 of title 13, the person shall not be afforded the benefits of deferment of sentence or parole; provided, that a person sentenced to life under subdivision (b)(3) of this section may be granted parole."

*randa v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

■ It is clear that "[a]n accused has an unqualified right to stop any interrogation and request consultation with an attorney. Once such a request is made, there can be no further questioning until the accused has had an opportunity to consult with a lawyer." *State v. Lachapelle*, 112 R.I. 105, 111, 308 A.2d 467, 470 (1973).

■ The state does not quibble with the proposition that if DeJesus had requested "legal assistance" then all interrogation should have ceased.[13] Indeed, Det. Hartnett testified that if DeJesus had requested "legal assistance," he would have understood that to be an unequivocal exercise of his right to have counsel. However, it was disputed whether DeJesus requested "legal assistance" or waived his rights during his meeting with Det. Hartnett at the ACI before Viera's undercover operation. Therefore, the threshold issue is whether DeJesus requested counsel.

■ Although the question of whether a defendant "knowingly, intelligently, and voluntarily waived" his rights is normally a mixed question of law and fact, whether DeJesus requested counsel or not is a question of fact. *See State v. Page*, 709 A.2d 1042, 1044 (R.I.1998). When reviewing questions of fact, we give deference to a trial justice's determination and we will not reverse such a finding unless it is "clearly erroneous." *Id.*

During the pretrial hearing, the trial justice heard testimony from both Det. Hartnett and DeJesus. After observing the witnesses on the stand, listening to their testimony, and weighing the respective credibility of each of them, the trial justice found that Det. Hartnett read DeJesus his rights at their first meeting, on June 20, 2003, which rights DeJesus intelligently and knowingly waived when he tried to exculpate himself from the robbery. The trial justice concluded that the interview ended after DeJesus asserted that he had nothing to offer the detective and after he contended that he would have helped him if he were able. In fact, the trial justice concluded "beyond peradventure," that DeJesus did not request any legal assistance at this time, or any time thereafter.

The trial justice concluded that DeJesus had confused the first meeting with Det. Hartnett at the ACI with the second meeting at the District Court, because DeJesus testified that Det. Hartnett confronted him on "robbery and death." However, on June 20, the date of the initial interview, Mauricio Flores was still alive—he did not die until July. The trial justice also credited Det. Hartnett's testimony over that of DeJesus' with respect to the second interview, finding that DeJesus hotly denied his involvement in the crime, but that again, he did not request legal assistance.

In our opinion, the trial justice was not clearly wrong in finding Det. Hartnett more credible than DeJesus. Both DeJesus and Det. Hartnett testified that DeJesus told Det. Hartnett at their first meeting that he would have helped the police if

---

**13.** *Miranda* requires that statements resulting from custodial interrogation be admitted at trial only if the defendant voluntarily, knowingly, and intelligently waived his rights to remain silent and to have counsel assist during interrogation. It is the state's burden to prove that defendant waived his rights by clear and convincing evidence. However, in *Illinois v. Perkins*, 496 U.S. 292, 296, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990), the United States Supreme Court held that an undercover officer, posing as a cellmate, was not required to inform the defendant of his *Miranda* rights or obtain a waiver. In that situation, in which the police atmosphere and coercive interrogation was lacking, the Court reasoned that voluntariness was not an issue. *Id.*

he could. This demonstrates that DeJesus expressed a willingness to talk to Det. Hartnett, but that he said he had no information to provide.

Because we have no basis to believe that the trial justice committed clear error, we affirm his ruling that DeJesus did not invoke his right to consult with an attorney. Therefore, we hold that DeJesus' recorded statements to Viera properly were admitted at trial.

## III

### Viera's Recorded Statements

■ Next, defendant argues that playing Viera's recorded statements to the jury violated his right to confrontation because he could not cross-examine Viera, who had died before the trial began. The defendant argues that *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), precludes the introduction of Viera's statements because, as a government informant wearing a recording device, Viera's statements were testimonial and DeJesus, therefore, had a right to confront him on cross-examination.

■ The Confrontation Clause contained in the Sixth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, as well as article 1, section 10, of the Rhode Island Constitution, guarantee an accused the right to be confronted with the "witness" against him. A witness is someone who bears testimony, or otherwise makes " 'a solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " *State v. Feliciano,* 901 A.2d 631, 640 (R.I.2006) (quoting

*Davis v. Washington,* 547 U.S. 813, 824, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006)).

Prior to *Crawford,* the United States Supreme Court already had addressed the issue of whether nonhearsay statements implicated a defendant's confrontation rights. In *Tennessee v. Street,* 471 U.S. 409, 411–12, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985), the defendant testified at trial that his confession had been coerced by the county sheriff. The defendant said that the sheriff had read the confession of defendant's accomplice and directed him to repeat the same story. *Id.* at 411, 105 S.Ct. 2078. The state then introduced the out-of-court confession of the accomplice, not for the truth of the matter asserted, but rather to show that the two confessions were markedly different. *Id.* at 412, 105 S.Ct. 2078. The Court held that the confrontation clause did not apply to statements that were offered as nonhearsay and that were not being used to imply that the defendant committed a crime. *Id.* at 414, 105 S.Ct. 2078.

In *Crawford,* the United States Supreme Court cited *Street* and affirmed its holding that the confrontation clause applied only to statements being offered for the truth of the matter asserted. *Crawford,* 541 U.S. at 59 n. 9, 124 S.Ct. 1354 (quoting *Street,* 471 U.S. at 409, 105 S.Ct. 2078) ("The [Confrontation] Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."). Thus, the critical issue we must address is whether Viera's statements were offered at trial to prove the truth of the matter asserted.[14]

After our review of the record, it could not be clearer to us that Viera's statements, recorded primarily in the form of

---

14. Rule 801(c) of the Rhode Island Rules of Evidence provides:

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

questions posed to defendant, were not offered at trial for their truth, and that the veracity of anything Viera said was completely irrelevant. What was important on the recording were *defendant's* responses.[15] We agree with the trial justice that Viera's statements merely provided the framework or context within which defendant's statements could be understood. *See State v. Johnson*, 667 A.2d 523 (R.I. 1995).

With respect to defendant's argument that Viera's statements should have been edited from the tape and redacted from the transcript, in our opinion, excising Viera's questions would have rendered the recording incomprehensible and created unnecessary confusion for the jurors. Because defendant's statements raise no Confrontation Clause concerns under either the United States or the Rhode Island Constitutions, they properly were admitted at trial.

## IV

### Teresa's 9–1–1 Telephone Call

▮ The defendant next argues that the admission of Teresa's 9–1–1 call into evidence at trial violated Rule 403 because it lacked relevance and was unfairly prejudicial. The state counters that the 9–1–1 call assisted in identifying DeJesus as the robber because defendant described Teresa as "religious" and mimicked her cry of "oh my God," similar to the incantation in Spanish on the 9–1–1 call. The defendant argues that the statements made on the 9–1–1 tape were irrelevant because the emergency call occurred outside of the earshot of the robber, and, therefore, the robber could not have known what Teresa

said when she rushed to her apartment to make the call. DeJesus also argues that playing Teresa's hysterical voice, as she chanted "Blessed God" and "Glorious God" over and over again, inflamed the jurors' passions and was so unfairly prejudicial that it substantially outweighed any probative value the information may have had.

▮ We have said that a trial justice's discretion to exclude evidence under Rule 403 must be used sparingly. *Wells v. Uvex Winter Optical, Inc.*, 635 A.2d 1188, 1193 (R.I.1994). It is only when evidence is marginally relevant and enormously prejudicial that a trial justice must exclude it. *State v. Silvia*, 898 A.2d 707, 717 (R.I. 2006) (citing *Wells*, 635 A.2d at 1193). Because "[t]he ultimate determination of the effect of evidence lies in the discretion of the trial justice," we will not disturb such a determination on appeal absent an abuse of discretion. *State v. Oliveira*, 774 A.2d 893, 924 (R.I.2001) (quoting *State v. Aponte*, 649 A.2d 219, 223 (R.I.1994)).

▮ We conclude that the trial justice did not abuse his discretion when he determined that the 9–1–1 call was more than "marginally relevant" in identifying defendant as the robber and that its probative value was not substantially outweighed by the danger of unfair prejudice. Determining the identity of the robber was the major issue at DeJesus' trial and "it is the state's burden to prove each element of a crime beyond a reasonable doubt." *Silvia*, 898 A.2d at 717 (quoting *State v. Carter*, 744 A.2d 839, 847 (R.I.2000)).

The state's theory in this case was that DeJesus demonstrated knowledge of facts about this robbery that were not known to the public because those facts were outside

---

**15.** Rule 801(d)(2) of the Rhode Island Rules of Evidence Rule provides that statements are not hearsay when,

"The statement is offered against a party and is (A) the party's own statement, in either the party's individual or a representative capacity * * *."

of the regular stream of public information. On the other hand, defendant tried to demonstrate that the information regarding the robbery that he had talked about either was known in the community or was revealed by Det. Hartnett to defendant directly.

The 9–1–1 call may have had the potential to inflame the passions of the jury, or create sympathy for the deceased or his family, but this does not overcome the high probative value of the evidence. Further, it is our opinion that the introduction of this evidence was not *unfairly* prejudicial and it was "no more [prejudicial] than that which 'is always sustained by the introduction of relevant evidence intended to prove guilt.'" *Silvia*, 898 A.2d at 717 (quoting *State v. Fenner*, 503 A.2d 518, 526 (R.I. 1986)). Indeed,

> "[a]ll evidence tending to prove guilt in a criminal trial is prejudicial to a defendant. * * * [N]o doctrine in the law * * * is designed to insulate [a] defendant from relevant truths[,] * * * even if such truths might lead the jury to draw less favorable inferences concerning defendant than if they were not exposed." *Oliveira*, 774 A.2d at 924.

We observe that only the first few minutes of the first of four 9–1–1 calls made by Teresa were played to the jury. We believe the state appropriately offered only that portion of the phone call that was necessary to show that Teresa's prayerful reaction was similar to the reaction described by defendant, and we conclude that this evidence was not improperly admitted.

## V

## The Constitutionality of G.L.1956 § 11–47–3.2(b)(3) and (c)

■ The final issue pressed on appeal is whether DeJesus' sentencing under § 11–47–3.2(b)(3) and (c) is constitutional. Section 11–47–3.2 requires the sentencing judge to impose a mandatory consecutive sentence after a defendant has been convicted of an offense in which a firearm is used and has caused the death of a person. The defendant raises a variety of constitutional challenges against the statute; however, because we recently have addressed the majority of these arguments, we will address only his contention that the statute violates his right to equal protection of the laws.[16]

The defendant argues that we must use strict scrutiny when analyzing this statute because it implicates defendant's fundamental right to liberty, guaranteed by the Fourteenth Amendment to the United States Constitution and article 1, section 10, of the Rhode Island Constitution. Although DeJesus concedes that the statute serves a compelling interest, he argues that the statute is not sufficiently tailored to withstand a constitutional challenge.

■ Statutory classifications by the state must have only a rational basis unless "the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 312, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976).

---

16. Most recently we upheld this statute against constitutional challenges in which the defendants argued that consecutive sentencing constituted cruel and unusual punishment and violated the Double Jeopardy Clause. We decline to revisit these issues and reaffirm our holdings in those cases. *See State v.* *Monteiro*, 924 A.2d 784, 793 (R.I.2007) (holding that § 11–47–3.2 did not violate either the Double Jeopardy Clause or constitute cruel and unusual punishment and reaffirming the holdings of *State v. Feliciano*, 901 A.2d 631, 648 (R.I.2006) and *State v. Rodriguez*, 822 A.2d 894, 904–08 (R.I.2003)).

■ Without doubt, murderers who use firearms are not a suspect class. Furthermore, we do not agree that a harsher sentence for a murderer who used a firearm, rather than some other instrumentality of death, implicates a defendant's fundamental right of liberty. After a defendant has been afforded the full panoply of rights guaranteed to an accused by our constitution, and once he has been convicted by a jury that finds him guilty beyond a reasonable doubt, sentencing statutes need only have a rational basis to survive scrutiny under the Equal Protection Clause. *See Chapman v. United States*, 500 U.S. 453, 465, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991). "Every person has a fundamental right to liberty in the sense that the Government may not punish him unless and until it proves his guilt beyond a reasonable doubt at a criminal trial conducted in accordance with the relevant constitutional guarantees." *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 535, 536 & n.16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)); *Cf. Morris v. D'Amario*, 416 A.2d 137, 141 (R.I.1980) (a juvenile held in detention awaiting a delinquency hearing possessed a fundamental right to liberty, so that the statute authorizing such detention was subject to strict scrutiny under the Equal Protection Clause).

In *Chapman*, 500 U.S. at 456, 111 S.Ct. 1919, the defendants brought a due-process challenge against a statute that required a mandatory minimum sentence of five years for the offense of distributing over one gram of lysergic acid diethylamide (LSD). The defendants argued that the statute that determined the lengths of their sentences in accordance with the weight of the LSD "carrier," [17] and not just the weight of the illegal drug, was unconstitutional. *Id.* The defendants argued that the statutory provision infringed on their fundamental right to liberty and could be upheld only if it withstood strict scrutiny. *Id.* at 464–65, 111 S.Ct. 1919. The defendants also argued that the weight of the carrier was an arbitrary factor. *Id.* at 464, 111 S.Ct. 1919. The United States Supreme Court disagreed, upholding the penalties because they had a rational basis in severely punishing large-volume drug trafficking. *Id.* at 465, 111 S.Ct. 1919. Although the Court was speaking in the context of a due-process argument and this defendant cites equal protection, we nonetheless find the Court's reasoning persuasive and agree that:

> "[A] person who has been so convicted is eligible for, and the court may impose, whatever punishment is authorized by statute for his offense, so long as that penalty is not cruel and unusual, * * * and so long as the penalty is not based on an arbitrary distinction that would violate the Due Process Clause of the Fifth Amendment. In this context, * * * an argument based on equal protection essentially duplicates an argument based on due process." *Id.*

We reject the defendant's argument that all murderers are similarly situated and should be sentenced alike. A heightened or reduced punishment because of the presence or absence of certain factors, such as a deadly weapon, is a central feature of sentencing and is completely reasonable. There hardly can be debate that this classification has a rational basis in deterring the use of firearms. We hold that it is not an arbitrary distinction amongst murderers to punish those who use fire-

---

17. A carrier is the non-drug element that decreases the purity of the drug and makes it ingestable. Also referred to as the dilutant, cutting agent, or carrier medium by the Court. *Chapman v. United States*, 500 U.S. 453, 453–54, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991).

arms more severely than those who do not. Therefore, we uphold the constitutionality of § 11–47–3.2(b)(3) and (c) and affirm the defendant's sentence.

## VI

### Conclusion

For the reasons stated in this opinion, we affirm the judgments of conviction. The record shall be returned to the Superior Court.